IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CANDUS THOMSON
 *Plaintiff*,

 v.

MARK BELTON
 *Defendant*.

Civil Action No. ELH-18-3116

## MEMORANDUM OPINION

In this Memorandum Opinion, I shall elaborate as to the basis for my oral ruling and Order of November 2, 2018 (ECF 25), granting the motion for preliminary injunction (ECF 2) filed by Candus Thomson, plaintiff. In the Order, I directed defendant Mark Belton, Secretary of the Maryland Department of Natural Resources ("DNR"), to restore plaintiff to the job position she held with the agency on September 17, 2018, when she posted an arguably inappropriate comment on Facebook concerning a Maryland gubernatorial candidate.

Thomson served for several years as the "public information officer" for the Natural Resources Police ("NRP"), a subdivision of DNR (ECF 1-3, original job description, at 2). On October 9, 2018, she filed suit against Secretary Belton, both in his individual and official capacity (ECF 1, "Complaint"), alleging that she was unlawfully stripped of her media-related job duties because, in the early hours of Monday, September 17, 2018, while in her own living room, using her own device, she responded to a Facebook post of a professional colleague by referring to Maryland gubernatorial candidate Ben Jealous as an "assclown." ECF 35 (Transcript of November 1, 2018 hearing) at 44-45; ECF 20-5 at 2-3 (screenshot of Facebook posts); *see also* ECF 1, ¶¶ 11, 12. Her comment was prompted by the candidate's decision to veto reporter Tamela

Baker's participation as a panelist in the only gubernatorial debate with Governor Larry Hogan. ECF 35 at 39-40; *see also* ECF 1, ¶¶ 9, 10, 13.

Pursuant to 42 U.S.C. § 1983, plaintiff alleges violations of her rights under the First and Fourteenth Amendments. ECF 1, ¶¶ 31-32. She also seeks declaratory and injunctive relief. *Id.* ¶¶ 33-35.[1] Specifically, she seeks "reinstatement of her duties" and "expungement from her human resources records [of] all references to the incident in question." *Id.* at 7.

Along with her verified Complaint (ECF 1), plaintiff submitted several exhibits: her fiscal year 2018 performance review (ECF 1-2) ("performance review"); NRP's official description of her position, signed February 19, 2016 (ECF 1-3); NRP's official description of Thomson's position, signed September 28, 2018 (ECF 1-4) ("new job description"); email correspondence between Thomson and DNR Deputy Secretary Joanne Throwe (ECF 20-6); a letter from plaintiff's counsel to defendant, dated September 27, 2018 (ECF 1-6); and a letter from plaintiff's counsel to defendant, dated October 4, 2018 (ECF 1-7).

Of relevance here, plaintiff also filed a "Motion for Temporary Restraining Order and/or Preliminary Injunction" (ECF 2), as well as a memorandum of law. ECF 2-1 (collectively, the "Motion"). In the Motion, she sought to enjoin Belton "from continuing any punishment of Plaintiff for her personal speech and immediately restoring Plaintiff to her previous responsibilities and duties as a Public Officer for the Natural Resources Police." ECF 2-1 at 2. She sought reinstatement through November 6, 2018, which was previously scheduled as her last date of employment with DNR.

---

[1] On November 6, 2018, plaintiff filed an Amended Complaint (ECF 28), seeking compensatory and punitive damages as well as attorneys' fees. However, this Memorandum Opinion does not address the Amended Complaint, as it was filed after the issuance of the preliminary injunction.

In response to the filings, on October 10, 2018, the Court held an emergency telephone conference with counsel for both sides. *See* ECF 7. At that time, counsel agreed to proceed on the request for a preliminary injunction, rather than the request for a temporary restraining order. *Id.*

Plaintiff subsequently filed a supplemental memorandum to the Motion. ECF 8. Defendant submitted its opposition. ECF 11 ("Opposition"). In response to plaintiff's request for production of documents (ECF 12-1), I granted limited documentary production by Order of October 24, 2018. ECF 13. Plaintiff filed her reply (ECF 20, "Reply"), along with multiple exhibits (ECF 20-1 to ECF 20-8), on October 29, 2018.

The Court held a Motion hearing on November 1 and November 2, 2018, at which testimonial and documentary evidence and argument were presented. *See* ECF 22; ECF 23.[2] Plaintiff was the sole witness for her side. Defense counsel called several witnesses: DNR Secretary Belton; DNR Deputy Secretary Joanne Throwe; DNR Director of Communications Stephen Schatz; and DNR Chief Public Information Officer Gregg Bortz.

At the conclusion of the hearing, because of the urgency of the matter, including plaintiff's impending departure from DNR on November 6, 2018, I delivered a brief oral ruling, granting the Motion, and issued an Order. *See* ECF 25. I also informed counsel and the parties that a written ruling would follow, in order to amplify, clarify, and explain the oral ruling.[3]

---

[2] Some of the exhibits submitted at the Motion hearing are duplicates of exhibits submitted in the parties' earlier filings. For the convenience of the reader, and when possible, I will cite to the docket number as it appears on the Court's electronic docket.

[3] To the extent that there is any inconsistency between the Court's oral ruling and this Memorandum Opinion, the Memorandum Opinion shall control.

# I. Factual Background[4]

Mark Belton is the Secretary of DNR. The DNR is Maryland's principal department for policy related to natural resources. The DNR Secretary "is responsible for the enforcement of all natural resource laws of the State[.]" Md. Code (2018 Repl. Vol.), § 1-202 of the Natural Resources Article ("N.R."). The NRP, a subdivision of DNR, "serves as a public safety agency with statewide authority to enforce conservation, boating, and criminal law." N.R. § 1-201.1(a). Its responsibilities include, *id.* § 1-201.1(b):

> (1) Providing maritime and rural search and rescue services;
> (2) Providing public education in hunting, boating, and water safety;
> (3) Providing primary law enforcement services for State parks, State forests, wildlife management areas, and public lands owned and managed by the Department; and
> (4) Serving as the lead agency for maritime homeland security on State waterways.

For almost five years, Thomson served as the "public information officer" with the NRP. *See* ECF 35 at 8; ECF 8 at 1. Plaintiff testified that she came to the NRP after a long career as a newspaper reporter and editor, including twenty-five years with The Baltimore Sun. ECF 35 at 5-7; *see also* ECF 1, ¶ 3. At the hearing, she testified that she was leaving the DNR on November 6, 2018. ECF 35 at 6. That departure was scheduled before the incident at issue. *Id.*

The NRP's original position description for Thomson appears to reflect her actual duties and responsibilities.[5] It states that the purpose of this "mission critical" position "is to ensure

---

[4] When I began working on this Memorandum Opinion, I did not have a transcript of the testimony presented at the hearing. Therefore, I relied on my notes. The transcripts were docketed on November 19, 2018 (ECF 34) and November 21, 2018 (ECF 35). Where the testimony coincides with a Motion exhibit, I sometimes cite only to the exhibit.

[5] On Thomson's performance evaluation, her supervisor, Gregg Bortz, checked "yes" in response to the question: "Does the employee's Position Description (PD) accurately reflect the current, and anticipated, duties and responsibilities for the upcoming review period?" ECF 1-2 at 2. Additionally, neither plaintiff nor defendant has alleged that the original position description is inaccurate.

NRP's and DNR's external and internal messaging is consistent with Administration priorities and NRP's & DNR's mission and goals . . . ." ECF 1-3 at 3. According to DNR, the "position directly impacts the agency's ability to publicize services and activities[] [as well as] educate, inform and encourage stewardship and public safety among Maryland's citizens and visitors." *Id.*

Thomson's most significant duties included acting (1) "as a spokesperson for the Department, responding to media inquiries about breaking stories and proactive initiatives" and (2) "as the administrator for NRP's social media accounts (Face Book [sic] and Twitter)." ECF 1-3 at 3. Thomson also had several other responsibilities, including preparing and disseminating "press releases about breaking stories involving the NRP to inform the media/public about the incidents and provide accurate, timely information"; "writ[ing] speeches and messaging for the [NRP] Superintendent" and keeping him abreast "of all media coverage regarding the Department"; and "maintain[ing] agency stats (such as fatal boating accidents, etc.)." ECF 1-3 at 3-4.

Notably, Thomson was not a political appointee. ECF 35 at 18; *see* ECF 1-3 at 2 (characterizing Thomson as a "Management Service" employee). *Compare* Md. Code (2015 Repl. Vol., 2018 Supp.), § 6-403 of State Personnel and Pensions Article ("S.P.P.") (defining a "management service" position) *with* S.P.P. § 6-405 (defining a "special appointment" position). She was hired while Governor Martin O'Malley, a Democrat, was in office, and she continued to work for the NRP under Governor Larry Hogan, a Republican, who took office in 2015. ECF 35 at 8.[6]

---

[6] Hogan was reelected to a second term following the statewide election held on November 6, 2018.

During plaintiff's tenure at NRP, she consistently received high praise and outstanding reviews from NRP and DNR personnel. On June 2, 2014, in her end-of-cycle performance review, Captain David Larsen, who was plaintiff's supervisor at the time, described plaintiff as an "outstanding" employee and indicated that her job performance was "Exceptional." Thomson Motion Ex. 2 (collection of supervisor comments) at 5. Two months later, Colonel George F. Johnson, IV wrote a letter to plaintiff to thank her for "doing an outstanding job." *Id.* at 3. In the January 5, 2015, mid-cycle review, Larsen again wrote that plaintiff "has done an excellent job." *Id.* at 4. He said the same thing in her reviews on July 2, 2015, and January 11, 2016. *Id.* at 1, 2. In 2015, Larsen also nominated Thomson for 2014 DNR Employee of the Year. Thomson Motion Ex. 7 (nomination letter). The following year, NRP awarded plaintiff a raise and retroactively applied it to 2015. Thomson Motion Ex.1 at 2-3 (raise paperwork). On January 20, 2017, NRP Colonel Robert K. Ziegler, Jr., plaintiff's supervisor and the head of the NRP, sent her a letter thanking her for her service on the NRP Strategic Recruitment Plan Workgroup. *Id.* at 1 (letter from Ziegler). He included this letter in plaintiff's personnel filed. *Id.*

Plaintiff continued to receive outstanding reviews in 2018. In plaintiff's review dated January 24, 2018, Lieutenant Colonel Ernest J. Leatherbury, Jr., then her supervisor, rated Thomson as excellent, the highest possible score, on all twenty "behavioral elements" used in the performance review. Thomson Motion Ex. 3 (2018 mid-cycle review) at 3. In his comments, Leatherbury stated that Thomson's "quality and quantity of work continues to exceed all expectations." *Id.* at 4.

In a review dated July 31, 2018, Gregg Bortz, plaintiff's new supervisor, rated her as excellent on fifteen behavioral elements and as satisfactory on five behavioral elements. ECF 1-2 at 3. She received perfect ratings on all five behavioral elements in the Customer Service category.

*Id.* According to the testimony, her "customers" were primarily DNR and NRP leadership. ECF 35 at 160, 234. Unlike in other reviews, Bortz provided plaintiff with tasks to achieve. He wrote, ECF 1-2 at 5:

> Attend Communications unit meetings and schedule more facetime with the rest of the media relations team. Consider spending a few hours a week in Communications to improve coordination between offices and facilitate eventual passdown. In addition to regular log updates, make sure manager is informed of relevant/controversial inquiries that may cross into other unit's area (wildlife, boating, etc.)[.]

Bortz also commented on plaintiff's performance, *id.*:

> Candy's work output is professional and outstanding, as is her work ethic in meeting a high volume of inquiries at all times of day. I would like to make sure we have more immediate heads-up of potentially controversial inquiries to assure better coordination across all units. Overall, Candy's skill, experience and institutional knowledge are tremendous assets to the department.

Despite plaintiff's positive performance review, Thomson declined to sign the performance review because she had not been notified that Bortz was her supervisor. ECF 35 at 20-22; ECF 1-2 at 5; Thomson Motion Ex. 5 at 5 (Bortz email regarding review). Moreover, Thomson testified that she emailed Belton and other senior DNR staff, requesting clarification of the chain of command, including disclosure of the identity of her supervisor. ECF 35 at 90-91. She also said that she noted in her email that her "MS-22 was woefully out of date" *Id.* at 90.

Secretary Belton promptly convened a meeting on August 1, 2018, at least partly in response to plaintiff's email. *Id.* at 133-34. Throwe, Ziegler, Schatz, Thomson, and Gwen Schindler, the Director of Human Resources, also attended the meeting. *Id.* at 90; Belton Motion Ex. 2 (Notes of Schindler from August 1, 2018 meeting). The Secretary advised Thomson that she needed to do a better job coordinating with DNR's Office of Communications. ECF 35 at 134. During the meeting, Belton informed plaintiff that she would be reporting to Schatz and should "touch base" with the Office of Communications about "all messages." Belton Motion Ex. 2.

Despite Thomson's outstanding performance reviews, Secretary Belton, Schatz and Throwe testified that they began experiencing problems with plaintiff in 2018. ECF 35 at 116, 133-34 (Belton); 179-80 (Schatz); 219-220 (Throwe). Specifically, they testified that plaintiff regularly failed to communicate and coordinate with the DNR Office of Communications and, by extension, DNR leadership. *Id.* They claimed that on multiple occasions, they were caught off guard as a result of a breakdown in communication. *Id.* at 114-15 (Belton); 179-81 (Schatz); 230 (Throwe). For example, Secretary Belton testified that plaintiff did not properly coordinate events, press conferences, and social media posts for the NRP's 150th anniversary. *Id.* at 158-59. In their testimony, Secretary Belton and DNR leadership highlighted three instances when plaintiff did not coordinate with the DNR Office of Communications, despite the instructions provided to her at the meeting on August 1, 2018. *Id.* at 114-16; 179, 188-91; 221-22.

The first incident occurred on August 7, 2018, when a chest containing human bones washed up on Stinky Beach in Ocean City. Schatz complained that Thomson did not alert them to NRP's participation in a press conference concerning the incident. *Id.* at 186-87. On August 10, 2018, Schatz emailed Bortz, Thomson's direct supervisor, to ask if Bortz "ping[ed] Candy yesterday about the media availability and utter lack of communication or coordination with the office or her supervisor?" Belton Motion Ex. 3 (Schatz's emails) at 1. Schatz also wrote: "We need to document all incidents and issues." *Id.*

But, Thomson testified, without contradiction, that NRP never participated in a press conference related to this event. ECF 34 (Transcript of November 2, 2018 hearing) at 80-81. Rather, upon discovery of the bones, an NRP officer merely secured the area until the Worcester County Sheriff's Office could take over. *Id.* at 81. Although the Sheriff's Office held a press conference, NRP did not participate in it or hold its own press conference. *Id.*

The second incident occurred on August 28, 2018, when a child tragically drowned at Sandy Point State Park. The next day, Schatz emailed Thomson requesting details about a tweet, presumably from NRP's Twitter handle. Belton Motion Ex. 3 (Schatz's emails) at 2.[7] In response, plaintiff sent him a detailed account of the occurrence. *Id.* Schatz then directed plaintiff to "please coordinate media events with Gregg [Bortz] before scheduling/publicizing." *Id.* According to Schatz's testimony, plaintiff had not coordinated the press response with the DNR Office of Communications. ECF 35 at 188-89.

Thomson testified, however, that she was on a prescheduled vacation in Maine at the time of the incident, and was not working at the time. ECF 34 at 77-78. However, Schatz was unaware

---

[7] NRP tweeted three times on August 28, 2018. They can be found at: https://twitter.com/MDNRPolice/status/1034584942448136194; https://twitter.com/MDNRPolice/status/1034596127482552325; and https://twitter.com/MDNRPolice/status/1034596127482552325.

NRP tweeted twice more in the morning of August 29, 2018. They can be found at: https://twitter.com/MDNRPolice/status/1034785786212827137; and https://twitter.com/MDNRPolice/status/1034800427630583809.

"[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *see* Fed. R. Evid. 201(b) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). And, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *cf. Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 Fed. Appx. 223, 227 (4th Cir. 2013) (noting that the court may take judicial notice of information on a website, "so long as the web site's authenticity is not in dispute"). However, "these facts [must be] construed in the light most favorable" to the non-movant. *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013) (*abrogated on other grounds by Reed v. Town of Gilbert, Ariz.*, —— U.S. ——, 135 S. Ct. 2218 (2015), *as recognized in Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015)).

that she was on vacation.  ECF 35 at 200.  Thomson also testified that no one at NRP or DNR ever complained to her about NRP's media response.  ECF 34 at 78.

The third incident involved a news article that appeared in the <u>Capital Gazette</u> that cast the NRP in an unfavorable light.[8]  On Sunday, September 16, 2018, an NRP officer drove through a red light while pursuing a suspect and collided with a SUV crossing the intersection.  Belton Motion Ex. 1 (Schatz email containing news article); Thomson Motion Ex. 22 (copy of news article).  The SUV driver, along with her mother, aunt, and a pet dog, were in the vehicle.  Belton Motion Ex. 1; Thomson Motion Ex. 22.  Unfortunately, the dog was killed in the accident.  Belton Motion Ex. 1; Thomson Motion Ex. 22.  The next day, Monday, September 17, 2018, Colonel Zeigler briefed Belton about the accident during a regular weekly meeting.  *See* ECF 35 at 114.  Notably, Thomson had no knowledge about the accident at that point in time.  ECF 34 at 67-68.

Captain Brian Rathgeb was the commander of the patrol area where the accident occurred.  *Id.* at 61-62.  Typically, when something of significance occurs concerning NRP, a message is sent out to all commanders, as well as Thomson and Schatz.  *Id.* at 57.  According to Thomson, she and Schatz are included as "part of [Schatz's] no-surprises motto."  *Id.*  However, no command text was disseminated on the date of the accident.  *Id.*  Moreover, Thomson was never provided with a Form 504, which provides her with the "who, what, where, when" of an incident and what she may share with the press.  *Id.* at 57-58.  Additionally, because Thomson did not have access to dispatch as a civilian, she could not have discovered the accident on her own initiative.  *Id.* at 58.

Indeed, Thomson never learned about the accident from NRP or DNR staff.  Rather, she learned of it from Chase Cook, a reporter with the <u>Capital Gazette.</u>  Cook called plaintiff on

---

[8] As of the date of this Memorandum Opinion's filing, the article is available at https://www.capitalgazette.com/news/for_the_record/ac-cn-nrp-crash-0919-story.html.

Tuesday morning, September 18, 2018. ECF 34 at 62. Cook asked her about the accident, specifically NRP's policies on officers driving through red lights and its internal investigation process. *Id.* at 63. In response, she said that if there was an accident, a different agency would investigate NRP, because it does not investigate itself. *Id.* at 62-63. She then asked about his timeline, and he replied that he was just starting to work on the article. *Id.* at 63. Thomson told Cook she would call him back. *Id.* After plaintiff hung up, she immediately texted Rathgeb, Zeigler, and Leatherbury, who is Rathgeb's supervisor. *Id.* at 64. She knew that all of them were together at a command meeting. *Id.* at 63-64. Major Kersey, in consultation with Thomson, decided that Rathgeb should respond to the inquiry because he had previously served in internal affairs and was the commanding officer when the accident occurred. *Id.* at 64-65.

At Thomson's request, Rathgeb notified her after speaking with Cook and told her that nothing significant happened on the call. *Id.* at 66. That is, Rathgeb neither indicated that he expected a critical article nor provided Thomson with any reason to expect one. Thomson then logged the event on a computer program used by NRP and DNR media personnel to record contacts with the media. *Id.* at 67. Bortz and Schatz have access to the program. *Id.* at 39-40.

At 4 p.m. that afternoon, September 18, 2018, the <u>Capital Gazette</u> published an article titled "Family Dog Killed, Two People Injured When Natural Resources Police Officer Crashes into SUV." Belton Motion Ex. 1; Thomson Motion Ex. 22. Twelve minutes later, Thomson emailed a copy of the article to Leatherbury, Rathgeb, and Zeigler. Belton Motion Ex. 1. About thirty minutes later, Schatz emailed a copy of the article to plaintiff. Belton Motion Ex. 3 at 4. In the article, the driver of the SUV reportedly said that the NRP officer who hit her vehicle "didn't offer any help." Belton Motion Ex. 1; Thomson Motion Ex. 22. She also alleged that the officer was

"'out of his car and on his phone.'" *Id.* Further, she complained that the NRP officer "'just had his lights on. No siren,'" and "'was flying'" through the intersection without hesitation. *Id.*

The next day, Wednesday, September 19, 2018, Schatz emailed Rathgeb, copying Thomson and Bortz and blind copying Belton and Throwe, stating: "We are getting a lot of heat regarding the <u>Capital Gazette</u> piece. Please coordinate with my office **before** commenting (or no[t] commenting) on this case (or any inquiry for that matter). Our standing mantra is, **'No Surprises!'**" Thomson Motion Ex. 23 (emphasis in original). He then separately emailed Leatherbury and Ziegler, stating: "Please let the rest of your staff know... all media inquiries/requests need to flow through Communications." Belton Motion Ex. 3 at 5 (ellipses in original).

Belton, Schatz, and Throwe testified that they were surprised to see an article about the accident, and displeased to see that it portrayed NRP in a negative light. ECF 35 at 122-23 (Belton); 190 (Schatz); 221-22, 242 (Throwe). Throwe testified that she and DNR leadership knew of the accident and the dog's death, but did not know that the officer had purportedly "delayed assisting with the accident with, when [sic] somebody was calling for help, or any of the details that were claimed in that article." *Id.* at 223. Similarly, Schatz testified: "We should know everything[.]" *Id.* at 191. According to the testimony of both Schatz and Throwe, they were displeased with Thomson for her failure to tell them about the accident as soon as it occurred. *Id.* at 202-03 (Schatz); 224-25 (Throwe). Yet, the uncontroverted evidence showed that Thomson had no knowledge of the occurrence until Tuesday, September 18, 2018. *Id.* at 62. The defense witnesses did not explain how Thomson could have known about the accident on the date that it happened. Moreover, the record contains no emails in which Belton, Bortz, Schatz, Throwe, or any other DNR personnel claimed that Thomson mishandled the occurrence.

According to Thomson's testimony, one day after the vehicle accident, at around 5 a.m. on Monday, September 17, 2018, she was at home looking at Facebook on her personal iPad. ECF 35 at 44-45; *see also* ECF 1, ¶ 12. Her friend, Bryan Sears, a news reporter, had posted a link on his personal Facebook page to a <u>Herald-Mail Media</u> story of September 17, 2018. ECF 20-5 at 2 (screenshot of the post); ECF 2-1, ¶ 3. The story was titled "Herald-Mail Media Reporter Vetoed from Gubernatorial Debate Panel." ECF 20-5 at 2.[9] According to the story, <u>Herald-Mail Media</u>, which primarily serves the Hagerstown, Maryland area, selected news reporter Tamela Baker to serve as the publication's panelist at the only gubernatorial debate between candidate Ben Jealous and Governor Larry Hogan.[10] But, Mr. Jealous vetoed Baker, requiring the publication to pick another person. Belton Motion Ex. 1. In response to Sears' Facebook post, someone commented: "Tamela Baker for President." Another person wrote: "If I were editor of the Herald-Mail, I'd run a banner headline 'Jealous Bans Our Reporter!'" ECF 20-5 at 3.

Thomson joined in by posting a one-word response: "Assclown." *Id.* She used her personal Facebook account and did not identify herself with her State employment. Moreover, according to both Schatz and Thomson, the Facebook post did not violate DNR's Social Media Policy. *Id.* at 46-47 (Thomson); 212-213 (Schatz); *see also* Thomson Motion Ex. 21 (DNR Social Media Policy).

OxfordDictionaries.com, an online dictionary produced by Oxford University Press, defines an "assclown" as "a stupid or contemptible person." Thomson testified that she intended her comment to describe Mr. Jealous as "inept." ECF 35 at 53.

---

[9] As of the date of this Memorandum Opinion's filing, the story is available at https://www.heraldmailmedia.com/news/local/herald-mail-media-reporter-vetoed-from-gubernatorial-debate-panel/article_e94eded6-badb-11e8-949a-8f01533acd99.html.

[10] As noted, the election was held on November 6, 2018.

Thomson testified that the next day, September 18, 2018, Ziegler asked her whether she had posted "assclown" on Facebook. ECF 20-4 at 2 (email from Ziegler to Throwe and Belton, dated Tuesday, September 18, 2018). Thomson acknowledged that she had. *Id.* Thomson offered to delete her comment from Facebook, and she testified that, of her own volition, she immediately did so. ECF 35 at 34-35.

Then, at 1:19 p.m. on Tuesday, September 18, 2018, Ziegler sent an email to Belton and Throwe, with the subject line "Candy and Facebook." ECF 20-4. Ziegler recounted his conversation with Thomson. Three minutes later, Throwe forwarded the email to Schatz and to Allan Fisher, DNR Assistant Secretary for Mission Support, stating: "FYI." Thomson Motion Ex. 10 at 1, 3. Two minutes later, Schatz forwarded the email to Bortz, without comment. *Id.* at 1.

At 6:47 p.m. on Tuesday, September 18, 2018, Amelia Chasse, Communications Director for the Office of Governor Hogan, sent an email to Schatz, including a screenshot of Thomson's Facebook post. Chasse wrote, ECF 20-5 at 2 (line break omitted):

> See below, this was brought to my attention earlier. I believe it has been flagged for the Secretary and handled as the comment has since been deleted, but wanted to make you aware [of the Facebook post] as this type of language – particularly about the governor's political opponent – is extremely inappropriate from a state employee. Feel free to call if you want to discuss.

Governor Hogan's Deputy Chief of Staff, Jeannie Riccio, was copied on the email. *Id.*

By Thursday, September 20, 2018, Secretary Belton reassigned Thomson. *See* ECF 20-3 at 2 (email from Throwe to Ziegler, with copies to Belton, Leatherbury, and Schatz); ECF 20-1 at 2 (email from Schatz to Ziegler and Leatherbury, with copies to Belton, Throwe, and Bortz). Notably, at 12:30 p.m. on Thursday, Schatz emailed Chasse, stating: "As instructed, we have reassigned Candy's duties to Lt. Catherine Medellin." ECF 20-8 at 2.

Belton acknowledged that he was "not happy" about Thomson's Facebook post. ECF 35 at 146. Schatz testified that he discussed the Facebook post with Secretary Belton, who was "not generally pleased" with it. *Id.* at 205-206. According to Schatz, Secretary Belton also said that he was going to call Colonel Zeigler and discuss the post. *Id.* at 206. Throwe also criticized the post. *Id.* at 248. Nevertheless, Secretary Belton, Schatz, and Throwe denied that Thomson's conduct played any role in her reassignment. *Id.* at 117 (Belton); 208-09 (Schatz); 248 (Throwe). Rather, Secretary Belton testified that the Capital Gazette article was "the straw that broke the camel's back" and caused him to reassign her. *Id.* at 121. Schatz used the same phrase to characterize the reason for Thomson's reassignment. *Id.* at 193.

On Thursday, Schatz instructed two DNR Police Commanders to take over all of Thomson's media duties. ECF 20-6; *see also* Thomson Motion Ex. 12 at 1 (Schatz email to Ziegler, Belton, Throwe, Leatherbury, and Bortz, dated Friday, September 21, 2018). The next day, September 21, 2018, while Thomson was at an NRP event in West Virginia, she learned that her media relations responsibilities had been reassigned. ECF 20-6 at 2 (email from Thomson to Belton, Throwe, Schatz, and others, Monday, September 24, 2018).

Plaintiff asked Ziegler about the reassignment, and he referred her to "'the Fourth Floor,'" meaning DNR headquarters, where the Secretary, Deputy Secretary, and human resources are located. ECF 35 at 68; ECF 20-6 at 2. In an email to Thomson dated Friday, September 21, 2018, Bortz wrote: "The directive I'm given is that Rathgeb (and also Medellin) are to be media points of contact and spokespeople." Thomson Motion Ex. 16 at 1.[11]

---

[11] According to the Complaint, Thomson also learned that her name and position had been removed from the list of contacts on DNR's website. ECF 1, ¶ 30.

On Monday, September 24, 2018, at 5:42 a.m., Thomson emailed Belton, Throwe, Schatz, and others.  ECF 20-6 at 2.  She wrote, *id.*:

> I start this week not knowing what my job is or what my duties are.  Apparently last Thursday I was stripped of the majority of my PIO duties . . . . I found this out more than 24 hours later by the two people who were assigned my duties, who showed me emails from Stephen Schatz that carried a Thursday time stamp.
>
> After the graduation ceremony attended by command staff, I asked Colonel Ziegler (who is on my MS-22 as my supervisor and who supervises and pays for my PIN) why this was happening so close to my final day at DNR.  He told me I would have to ask "the 4th floor and HR."  I later emailed Gregg Bortz (who is listed as my supervisor in Workday) about the matter.  He replied that he "hadn't had time to come up with a full plan" and suggested we could meet Monday morning.
>
> I figured one of you—or more than one—can take a few moments and provide an answer.
>
> Two questions, for starters:
> 1)  Why is this being done?
> 2)  What are my duties?

Throwe responded a day later.  ECF 20-6 at 3.  In response to Thomson's first question, "Why is this being done?", Throwe wrote, "Answer: Because it is management's prerogative. Management has reassigned your duties and has the right to do so as stated in State Personnel and Pensions (SPP) Article 7-602."  ECF 20-6 at 3.  Further, she quoted S.P.P. § 7-602, *id.*: "An appointing authority may reassign any employee within the appointing authority's jurisdiction to another position of equal grade and service for which the employee meets the minimum qualifications within the appointing authority's jurisdiction."  *Id.*

In response to Thomson's second question, asking about her duties, Thomson wrote, "Answer: You have received your MS-22. If you still have questions, please contact your supervisor, Gregg Bortz."  *Id.*

That day, Tuesday, September 25, 2018, Zeigler also sent an email to nearly all NRP personnel announcing that "any matters that would require any requests dealing with NRP's Public

Information Officer, should be directed to Lieutenant Catherine Medellin." Thomson Motion Ex. 20 (Ziegler email to NRP) at 1. He also stated that Medellin "will be covering NRP's PIO" and Tracy Sweeney "will be handling any social media (Facebook & Twitter) matters." *Id.* Additionally, it appeared from other emails that Rathgeb was to take on more media responsibilities. *See* Thomson Motion Ex. 12 at 1 (Schatz email to Ziegler, Belton, Throwe, Leatherbury, and Bortz, dated Friday, September 21, 2018) ("Only the lieutenant [Medellin] or her designate (Capt. Rathgeb) will serve in this 'Public Information Officer' capacity"); Thomson Motion Ex. 16 at 1 (Bortz email to Ziegler, Leatherbury, Belton, Throwe, and Bortz, dated Friday, September 1, 2018) ("The directive I'm given is that Rathgeb (and also Medellin) are to be media points of contact and spokespeople"); Thomson Motion Ex. 14 at 1 (Schatz email to Thomson, dated Monday, September 24, 2018) ("Both [Sweeney and Bortz] will rely on Brian [Rathgeb] and Catherine [Medellin] (copied here) to facilitate any media inquiries or social media posts."); Thomson Motion Ex. 18 at 1 (Ziegler email to Throwe, Belton, Schatz, and Leatherbury, dated September 25, 2018) (stating that Rathgeb "was acting PIO for last weekend").

Thomson testified that her new role consisted largely of clerical duties and removed her main responsibilities. ECF 35 at 11. The new job description for this role supports this characterization. *See* ECF 1-4.

According to the description, Thomson's "position is responsible for supporting development of external and internal communications that inform and educated [sic] the people of Maryland . . . regarding public safety and other department related activities and programs." ECF 1-4 at 3. Each of her job functions is weighted according to "% of Time and/or Weight of Importance." ECF 1-4 at 3. Sixty percent of her time or the importance of her new position is

related to writing or editing "communications-related items" and "document work flow processes to provide direction/guidance for Natural Resource Police communicators[.]" *Id.*

Of import, Thomson was no longer allowed direct contact with the press. *See* ECF 1-4 at 4 ("Directs all media/public inquiries to the appropriate Public Information Officer(s) and their designees."). She no longer led other employees. *Compare* ECF 1-4 at 5, *with* ECF 1-3 at 7. Nevertheless, she still "writes briefing materials, remarks, reports and speeches for department leadership, including but not limited to the colonel and secretary." ECF 1-4 at 4.

Additionally, in her new role, Thomson no longer had an assigned State vehicle. Throwe emailed Zeigler to reiterate this point on Monday, September 24, 2018. She wrote: "Since only a NRP PIO is authorized to have a state vehicle[], I would like an explanation as to why Candy was driving a state car this weekend." ECF 20-7 (email from Throwe to Zeigler, Leatherbury, Belton, and Schatz, dated Monday, September 24, 2018). Throwe continued: "Effective immediately, Candy should not be assigned a state vehicle but she can sign one out in the vehicle pool if she needs to travel for any assigned DNR duties." *Id.*

As indicated, prior to the incident, Thomson had given notice of her intended resignation from DNR. She initially planned to leave during the spring of 2018, but personal emergencies caused her to delay her departure at least twice. Thomson Motion Ex. 16 at 4 (email from Thomson to Ziegler and Leatherbury, dated July 17, 2018). Ultimately, on July 17, 2018, she designated her final day of work at DNR as November 6, 2018. *Id.* at 4.[12]

## II.     Standard of Review

---

[12] Presumably, because that date was a holiday for State employees (election day), her last day in the office was November 5, 2018.

Rule 65 of the Federal Rules of Civil Procedure governs preliminary injunctions. Under Rule 65(a), a court "may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(l). The Fourth Circuit has explained, *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999):

> Although Rule 65(a)(1) does not specify what length of notice is required, the Supreme Court has explained that the defendant must be "given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 433 n. 7 (1974). Notice on the day of the preliminary injunction hearing itself does not satisfy Rule 65(a)(1). *Id.* By contrast, temporary restraining orders may be issued without full notice, even, under certain circumstances, ex parte. Fed.R.Civ.P. 65(b).

As indicated, during the telephone conference on October 10, 2018, counsel for the parties agreed to treat the Motion as one for a preliminary injunction. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000) (explaining that "broad discretion is given to the district court to manage the timing and process for entry of all interlocutory injunctions—both TROs and preliminary injunctions—so long as the opposing party is given a reasonable opportunity, commensurate with the scarcity of time under the circumstances, to prepare a defense and advance reasons why the injunction should not issue.").

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren.* 553 U.S. 674, 689-90 (2008)); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds and remanded*, 130 S. Ct. 2371 (2010), *reaff'd in part and remanded*, 607 F.3d 355 (4th Cir. 2010). And, it is a remedy that is "'granted only sparingly and in limited circumstances.'" *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).

Notably, "[a] plaintiff seeking a preliminary injunction must establish [1] that [she] is likely to succeed on the merits, [2] that [she] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [her] favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citing *Munaf*, 553 U.S. at 689-90; *Amoco Prod Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)); *see also Benisek v. Lamone*, ____ U.S. ____, 138 S. Ct. 1942, 1944 (2018); *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011); *Real Truth About Obama*, 575 F.3d at 345 (applying the standard for preliminary injunctions set forth in *Winter*). All four elements must be satisfied. *The Real Truth About Obama, Inc.*, 575 F.3d at 346. And, the "'[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction.'" *Direx Israel*, 952 F.2d at 812 (quoting *Tech. Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *Shaffer v. Globe Prod, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)); *see Winter*, 555 U.S. at 22 (recognizing that because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that plaintiff is entitled to such relief").

"[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *Musgrave*, 553 F.3d at 298 (citation omitted). As the Fourth Circuit said in *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011), albeit in the context of permanent injunctive relief, "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* at 302 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Ordinarily, such a threatened injury to a plaintiff will "easily outweigh[] whatever burden the injunction may impose," because the government "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Id.* at 302-03. However, when a court considers a First Amendment retaliation claim, the government's interest in the efficient operation of a workplace may be harmed by issuance of an injunction. *See Pickering v. Bd. of Ed. of Township High School Dist. 205*, 391 U.S. 563, 568 (1968). A finding that plaintiff is likely to succeed on the merits necessarily entails a balancing of interests between the employee and the government. *Id.*

### III.     42 U.S.C. § 1983

Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, ___ U.S. ___, 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but [instead] provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48

(1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 181 (4th Cir. 2009) ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient." (citations and internal quotation marks omitted)). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips*, 572 F.3d at 180 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)).

Section 1983 also requires a showing of personal fault based upon a defendant's own conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). Thus, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

To establish supervisory liability under § 1983, the plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *see also Wilkins v. Montgomery*, 751 F.3d 214 (4th Cir. 2014).

Nevertheless, Section 1983 is still "'read against the background of tort liability that makes a [person] responsible for the *natural consequences* of his actions[.]'" *Vinnedge*, 550 F.2d at 928 (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)) (emphasis and bracket added); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978) ("Congress . . . specifically provide[s] that A's tort became B's liability if B "caused" A to subject another to a tort[.]").

Defendant contends that he is not liable in his individual capacity because plaintiff has not alleged that "Mr. Belton acted personally in the deprivation of the plaintiff's rights" and, under 42 U.S.C. § 1983, an individual cannot be liable on the basis of respondeat superior. ECF 11 at 10. In response, plaintiff presented two emails referencing an order from Secretary Belton to reassign Thomson's duties. *See* ECF 20 at 3-4; *see also* ECF 20-1 at 2; 20-3 at 2.[13]

The evidence demonstrated that Secretary Belton was personally involved in the reassignment of Thomson. On September 20, 2018, Deputy Secretary Joanne Throwe emailed

---

[13] At the Motion hearing, defendant seemed to abandon his contention in his Motion that the allegations as to his personal involvement were insufficient.

Colonel Ziegler to request "the name of the new acting PIO [Public Information Officer] for NRP effective today. Per Mark[] [Belton's] instructions, we will be giving Candy other duties as assigned." ECF 20-3 at 2. The following day, September 21, 2018, DNR Communications Director Stephen Schatz wrote in an email to Ziegler and another DNR staffer, copying plaintiff's supervisor, Gregg Bortz, as well as Throwe and Belton, ECF 20-1 at 2 (bold in original, italics added), as follows:

> *On order of Secretary Belton* and by direction of Col. Ziegler, Lt. Medellin has been assigned all communications and media relations duties/responsibilities for the Maryland Natural Resources Police. This entails all interactions with the press and public, including closely coordinating/working with the Office of Communications on media inquiries/requests, remarks, social media and other related duties as they arise. Only the lieutenant or her designate (Capt. Rathgeb) will serve in this "Public Information Officer" capacity.

> This order is effective as of **Sept. 20, 2018**.

These emails unequivocally show that Secretary Belton was involved in ordering plaintiff's reassignment. This established that the § 1983 claim is based on Belton's personal conduct.

## IV. First Amendment

The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

"The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). "'Premised on mistrust of governmental power'" it "stands against attempts to disfavor certain subjects or viewpoints.'" *Am. Civil Liberties Union of N. Carolina v. Tata*, 742 F.3d 563, 565-66 (4th Cir. 2014) (quoting

*Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 340 (2010)). Accordingly, governmental "[r]estrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)). The Free Speech Clause is made applicable to the States via the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652 (1925).

The Constitution does not permit the government to do indirectly what it cannot do directly. *See*, *e.g.*, *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 77-78 (1990) ("What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly."). Consequently, the right of free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. Civil Liberties Union of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993).

Thomson argues that Secretary Belton reassigned her in retaliation for her Facebook comment, and that his conduct violated her First Amendment rights. She maintains that although she was a public employee, she spoke as a private citizen and her comment constituted protected speech because it addressed a matter of public concern and did not disrupt DNR's operation of an efficient workplace. ECF 2-1 at 8-9; ECF 8 at 3, 5-7. Further, Thomson claims that limitations on the disloyal speech of an employee serving in a partisan position do not apply here because she was not a political appointee and her speech was not disloyal to her employer. ECF 2-1 at 8-9.

Secretary Belton disputes that the reassignment was in response to the Facebook comment. Moreover, he contends that Thomson has not shown a sufficient causal relationship between her Facebook comment and subsequent reassignment, so as to establish a First Amendment retaliation claim. ECF 11 at 14-15. However, Secretary Belton maintains that even if he had demoted plaintiff because of her comment, the demotion was constitutional because the Public Information Officer is a "communicator," similar to a "policymaker." *Id.* at 20. He reasons that Thomson was "a visible representative of the NRP." *Id.* at 21; *see id.* at 19-22. Further, he asserts that plaintiff "had a significant amount of discretion in developing and engaging in communications with the media and the public on behalf of the Department." ECF 11 at 21.

### A. *Connick/Pickering*

As noted, plaintiff contends that her employer retaliated against her because of her Facebook post. It is clear that posting a comment on Facebook constitutes speech. *Bland v. Roberts*, 730 F.3d 368, 385-86 (4th Cir. 2013).

 "Protection of the public interest in having debate on matters of public importance is at the heart of the First Amendment." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). And, as the Supreme Court has recognized, public sector employees play a crucial role in this debate "on subject matter related to their employment . . . because those employees gain knowledge of matters of public concern through their employment." *Lane v. Franks*, 573 U.S. 228, ___, 134 S. Ct. 2369, 2379 (2014).

To be sure, "government employees do not forfeit their constitutional rights at work." *Bland*, 730 F.3d at 373. But, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v.*

*Ceballos*, 547 U.S. 410, 422 (2006). Thus, "the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public." *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (internal quotation marks omitted).

In *Connick v. Myers*, 461 U.S. 138 (1983) and *Pickering v. Bd. of Edu.*, 391 U.S. 563 (1968), the Supreme Court explained that "the rights of public employees to speak as private citizens must be balanced against the interest of government in ensuring its efficient operation." *Bland*, 730 F.3d at 373 (explaining *Connick* and *Pickering*). Moreover, the Supreme Court has "acknowledged the government's countervailing interest in controlling the operation of its workplaces." *Franks*, 134 S. Ct. at 2377.

Under *Connick/Pickering*, in assessing a public employee's claim that an adverse employment action violated his rights under the First Amendment, courts must consider (1) whether the employer took a retaliatory, adverse action against the employee; (2) whether the employee was speaking as a citizen on a matter of public concern; (3) whether the employee's interest in speaking on the matter of public concern outweighed the government's interest in managing the operation of the workplace and providing efficient services to the public; and (4) whether the employee's speech was a substantial factor in the adverse action. *See*, *e.g.*, *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013); *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012); *McVey*, 157 F.3d at 277-78; *Liverman v. City of Petersburg*, 844 F.3d 400, 409 (4th Cir. 2016); *Dyer v. Md. State Bd. of Educ.*, 187 F. Supp. 3d 599, 616 (D. Md. 2016), *aff'd*, 685 Fed. App'x 261 (4th Cir. 2017) (per curiam); *see also Shenoy v. Charlotte-Mecklenburg Hosp. Auth.*, 521 F. App'x 168, 172 (4th Cir. 2013) (quoting *Davis v. Cook County*, 534 F.3d 650, 653 (7th Cir. 2008))

("*Garcetti* 'asked a preliminary question: was the expression something done pursuant to the employee's professional duties? If so, then the First Amendment has no application.'").

In *Pickering*, 391 U.S. at 568, the Court determined that a school board could not fire the plaintiff, a public school teacher, for writing a letter to a newspaper critical of the school board's "handling of . . . bond issue proposals and its subsequent allocation of financial resources," because the school board's "interest . . . in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." The Court reasoned: "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Pickering*, 391 U.S. at 572. But, in *Connick*, 461 U.S. at 142, the Supreme Court concluded that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

### 1. Sufficiently retaliatory actions

As a threshold matter, an employee must first establish that the employer took a sufficiently retaliatory action against the employee. *Suarez*, 202 F.3d at 686; *see, e.g.*, *Sullivan v. City of Frederick*, JKB-17-1881, 2018 WL 337759, at *5 (D. Md. Jan. 9, 2018), *aff'd*, 738 F. App'x 198 (4th Cir. 2018); *Farrell v. Bd. of Educ. of Allegany Cty.*, GLR-16-2262, 2017 WL 1078014, at *4 (D. Md. Mar. 21, 2017).

"[C]ourts have required that the nature of the retaliatory acts committed by a public employer be more than *de minimis* or trivial." *Suarez*, 202 F.3d at 686 (emphasis in original). But, retaliatory acts are not limited to discharge or termination of employment. For example, the Supreme Court held that an employee is adversely affected when his public sector employer "makes decisions, which relate to 'promotion, transfer, recall, and hiring,' based on the exercise of an employee's First Amendment rights. *Id.* (citing *Rutan*, *supra*, 497 U.S. at 79). The Court did not decide whether "an employment action less onerous than those amounted to a constitutional deprivation." *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995).

However, courts have recognized that a "transfer" or "reassignment" may constitute an adverse employment action. The Fourth Circuit determined that the "transfer or reassignment" of a public school assistant principal to a teaching position "qualifie[d] as an adverse employment action for purposes of her free speech claim," because it "was a demotion in duties and responsibilities." *Love-Lane v. Martin*, 355 F.3d 766, 779-80 (4th Cir. 2004) (citing *DiMeglio*, 45 F.3d at 806-07). Notably, the aggrieved employee did not suffer a salary cut. *Love-Lane v. Martin*, 201 F. Supp. 2d 566, 572 (M.D.N.C. 2002), *aff'd in part, vacated in part, remanded*, 355 F.3d 766 (4th Cir. 2004). Additionally, another judge of this Court has concluded that the government employer retaliated when the school board "significantly changed" the job responsibilities of an

assistant supervisor, "placing her in a position equivalent to a teacher's classroom assistant." *Farrell*, 2017 WL 1078014, at *1, *5.

Similarly, the Fifth Circuit has determined that "to be equivalent to a demotion" and therefore an adverse action, "a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999); *see also Suarez*, 202 F.3d at 686 (citing *Sharp*, 164 F.3d at 933).

"On the other hand, courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." *Suarez*, 202 F.3d at 686 (citing *Benningfield v. City of Houston*, 157 F.3d 369, 376-77 (5th Cir. 1998) (holding that employees "falsely accused" of criminal wrongdoing and "verbally reprimanded" by their employer failed to allege adverse employment actions sufficient to constitute retaliation) and *Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir.1997) (holding that an employer's criticism of employees and failure to award them merit pay increases did not constitute actionable adverse employment actions)); *see also Farrell*, 2017 WL 1078014, at *5 (concluding that negative employee evaluations were insufficient to establish a retaliatory action).

### 2. Speaking as a citizen upon a matter of public concern

The court must also consider "whether the [public] employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418. When "an employee does not speak as a citizen, or does not address a matter of public concern, 'a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 386 (2011) (quoting

*Connick*, 461 U.S. at 147).  That is, if the employee is (1) not speaking on a matter of public concern or (2) not speaking as a citizen, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech."  *Garcetti*, 547 U.S. at 418.

In this regard, an employee must first show that his statement can "be fairly characterized as constituting speech on a matter of public concern." *Borzilleri v. Mosby*, 874 F.3d 187, 194 (4th Cir. 2017) (citing *Connick*, 461 U.S. at 146).  Whether the speech relates to a matter of public concern turns on "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48; *accord, e.g.*, *Durham*, 737 F.3d at 300.  Generally, speech "'involves a matter of public concern when it involves an issue of social, political, or other interest to a community.'" *Liverman*, 844 F.3d at 409 (quoting *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004)); *accord Durham*, 737 F.3d at 300.  "For purposes of this inquiry, it does not matter how interesting or important the subject of an employee's speech is, and the place where the speech occurs is also irrelevant." *Adams*, 640 F.3d at 564-65.

By contrast, when speech involves "'matters only of personal interest,'" it is not protected, "in the absence of unusual circumstances." *Grutzmacher v. Howard Cty.*, 851 F.3d 332, 343 (4th Cir.) (quoting *Seemuller v. Fairfax Cty. Sch. Bd.*, 878 F.2d 1578, 1581 (4th Cir. 1989)), *cert. denied sub nom. Buker v. Howard Cty., Md.*, 138 S. Ct. 171 (2017).  Moreover, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987); *see also Grutzmacher*, 851 F.3d at 343 (recognizing crude Facebook comments as "a commentary" on gun control and thus a matter of public concern).

Second, the employee must show that he was speaking as a citizen and not "pursuant to [his] official duties." *Borzilleri*, 874 F.3d at 194 (citing *Garcetti*, 547 U.S. at 421).  When public

employees speak pursuant to their official duties, they "are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

Courts "engage in a 'practical' inquiry into the employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of those ordinary duties." *Hunter v. Town of Mocksville*, 789 F.3d 389, 397 (4th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 422, 424). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Franks*, 134 S. Ct. at 2379; *accord Hunter*, 789 F.3d at 397. Therefore, the determination does not turn on whether the employee spoke on the "'subject matter of his employment.'" *Franks*, 134 S. Ct. at 2379 (quoting *Garcetti*, 547 U.S. at 421) (alteration omitted).

### 3. Employer's decision to take adverse employment action.

"The plaintiff bears the initial burden of proving that his exercise of his First Amendment rights 'was a "substantial" or "motivating" factor in the employer's decision'" to take an adverse employment action. *Bland*, 730 F.3d at 375 (quoting *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993)); *see also Liverman*, 844 F.3d at 409; *McVey*, 157 F.3d at 277-78; *Sales v. Grant*, 158 F.3d 768, 775-76 (4th Cir. 1998). The "plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity," but the defendant's "'[k]nowledge alone . . . does not establish a causal connection' between the protected activity and the adverse action." *Constantine*, 411 F.3d at 501 (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)). "There must also be some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501 (four-month lapse between speech and alleged retaliation was a sufficient causal connection to overcome a motion to dismiss).

If the employee demonstrates that she has been penalized for her constitutionally protected speech, "the defendant will avoid liability if he can demonstrate, by a preponderance of the evidence, that he would have made the same employment decision absent the protected expression." *Bland*, 730 F.3d at 375 (citing *Sales*, 158 F.3d at 776). But, at least at the summary judgment stage, "an employer cannot insulate himself from liability . . . simply by asserting that an adverse employment decision had in fact already been made, without being memorialized or conveyed to anyone, before the employer learned of the protected conduct." *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011); *accord Caruso v. City of New York*, 973 F. Supp. 2d 430, 454 (S.D.N.Y. 2013).

### 4. Balancing employee's speech rights against employer's efficiency interest

A court must "balance the First Amendment interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Guarnieri*, 564 U.S. at 386 (quoting *Pickering*, 391 U.S. at 568). "[T]his balancing test is a 'particularized' inquiry." *Gruzmacher*, 851 F.3d at 348 (quoting *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 356 (4th Cir. 2000)). Therefore, a court "must consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace." *Bland*, 730 F.3d at 374; *see Joyner v. Lancaster*, 815 F.2d 20, 23 (4th Cir. 1987).

In *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 317 (4th Cir. 2006), the Fourth Circuit identified factors to guide this analysis, as follows:

> whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8)

conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

The level of protection afforded to an employee given to an employee's speech also varies based on the employee's position with the employer. Of relevance here, an employee "who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee." *McVey*, 157 F.3d at 278.

The level of protection also depends on the relationship of the speech and the employment. "[W]hen government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification 'far stronger than mere speculation' in regulating it.'" *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (quoting *United States v. Nat'l Treasury Employees Union* [*NTEU*], 513 U.S. 454, 465 (1995)). Unrelated speech is typically engaged in on the employees' "own time on topics unrelated to their employment." *Roe*, 543 U.S. at 80. By contrast, related speech "typically" addresses "matters concerning government policies that are of interest to the public at large." *Id.*

To my knowledge, neither the Supreme Court nor the Fourth Circuit has devised a test or articulated a definitive set of factors for courts to distinguish related and unrelated speech. But, the Supreme Court's review of several factors in *Roe* is instructive. There, before determining that a police officer's pornographic videos were related speech, the Court considered whether: (1) the employee connected his speech to his employer, *id.* at 81; (2) the speech had an "'effect on the mission and purpose of the employer,'" *id.* at 80 (quoting *NTEU*, 513 U.S. at 465); (3) the speech violated the employer's regulations, *id.* at 81; and (4) the speech was "harmful to the proper functioning" of the employer." *Id.*

## B. *Elrod-Branti* Exception

When a public employee's "discharge" is premised on the employee's "political beliefs and affiliation," the balancing test set forth above does not necessarily apply. *See Bland*, 730 F.3d at 374. Rather, under the so-called *Elrod-Branti* doctrine, discussed *infra*, the Supreme Court has identified a narrow exception to the Free Speech Clause's general protection of employees' rights, by which employees in policymaking positions are subject to dismissal based on political affiliation. *See Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980).

In *Elrod*, 427 U.S. at 373, a plurality of the Supreme Court found that "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments." Similarly, in *Branti*, 445 U.S. at 516-17, the Court recognized, generally, that "the First Amendment prohibits the dismissal of a public employee solely because of his private political beliefs." Therefore, "public employees who allege that they were discharged . . . solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments." *Elrod*, 427 U.S. at 349.

The defendant in *Elrod* was a newly elected Democratic sheriff who discharged several Republican employees of the Sheriff's Office "solely because they did not support and were not members of the Democratic Party . . . ." 427 U.S. at 351. One of the discharged employees was "Chief Deputy of the Process Division and supervised all departments of the Sheriff's Office" at a certain location; another employee was a courthouse "bailiff and security guard"; a third employee was a process server in the office. *Id.* On First Amendment grounds, the employees sued in federal court to enjoin their termination. A plurality of justices of the Supreme Court held that the district court should have granted the injunction. *See id.* at 373.

A three-justice plurality opined that "the practice of patronage dismissals is unconstitutional" because "any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on the First Amendment freedoms." *Id.* at 373. Two concurring justices articulated an exception to that general principle, viewing the case as presenting only a "single substantive question": "whether a *nonpolicymaking, nonconfidential* government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id.* at 375 (Stewart, J., concurring) (emphasis added). The concurring justices "agree[d] with the plurality" that such an employee could not be dismissed on the basis of political affiliation. *Id.*

Four years later, in *Branti*, 445 U.S. 507, a majority of the Court reaffirmed *Elrod's* holding, in the context of the imminent firing of two Republican assistant public defenders by a Democratic public defender. *See id.* at 508-09. In so doing, the *Branti* Court reformulated the *Elrod* concurrence's exception to the prohibition of dismissal on the basis of political affiliation for "policymaking" or "confidential" employees. The *Branti* Court said: "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518.

The Supreme Court's formulation of the doctrine put the onus on the employer to establish that a particular employee comes within the exception to the rule barring discharge of a public employee based on political affiliation. *Id.* at 518. It concluded that the assistant public defenders did not fall into the exception to the general rule barring termination on the basis of political affiliation, even though, in some respects, they were involved in policymaking or privy to confidential information. *Id.* at 519-20.

Notably, the *Elrod-Branti* doctrine is not limited to discharge or termination of employment. The Supreme Court has also held that the *Elrod-Branti* doctrine applies where a government employer bases "promotion, transfer, recall and hiring decisions ... on party affiliation and support . . . ." *Rutan*, *supra*, 497 U.S. at 79.

Thus, with respect to the discharge of a public employee for political reasons, the Fourth Circuit has articulated a two-part test. *See Stott v. Haworth*, 916 F.2d 134 (4th Cir. 1990). First, the court must consider whether "'the position at issue, no matter how policy-influencing or confidential it may be, relates to partisan political interests . . . or concerns.'" *Nader v. Blair*, 549 F.3d 953, 959 (4th Cir. 2008) (quoting *Stott*, 916 F.2d at 141) (original omissions). Specifically, the court must determine "whether 'the [plaintiff's] position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation.'" *Bland*, 730 F.3d at 375 (quoting *Stott*, 916 F.2d at 141) (alterations in *Bland*). To make this determination, the court must "examine the issues dealt with by the employee 'at a very high level of generality[.]'" *Bland*, 730 F.3d at 375 (quoting *Fields v. Prater*, 566 F.3d 381, 386 (4th Cir. 2009)).

Second, if the position does relate to partisan political interests, then the court must "'examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement.'" *Bland*, 730 F.3d at 375 (quoting *Stott*, 916 F.2d at 142). For this step, the Court undertakes "'a much more concrete analysis'" of "'the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office.'" *Bland*, 730 F.3d at 375 (quoting *Fields*, 566 F.3d at 386, and *Stott*, 916 F.2d at 142). This analysis focuses "on the

job description for the position in question." *Bland*, 730 F.3d at 375.  A court "'only look[s] past the job description where the plaintiff demonstrates some systematic unreliability, such as where the description has been manipulated in some manner by officials looking to expand their political power.'" *Id.* (quoting *Nader*, 549 F.3d at 961).

The state's designation of an employee as political "creates a presumption at law." *Stott*, 916 F.2d at 142.  However, although "deference must be given to the decision to . . . designate . . . positions as exempt[,]  . . . that decision is not unreviewable. The matter is a question of law to be ultimately decided by the courts." *Id.* at 142-43.

The Supreme Court has advised that "'[a]n employee with responsibilities that are not well defined or are of broad scope' is more likely to be a policymaker." *Nader*, 549 F.3d at 959 (quoting *Elrod*, 427 U.S. at 368).  It has further advised courts to consider "whether the employee acts as an advisor or formulates plans for the implementation of broad goals." *Elrod*, 427 U.S. at 368. The Fourth Circuit has also provided several "[o]ther relevant factors in distinguishing a policymaker from a nonpolicymaker," including "'relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders.'" *Nader*, 549 F.3d at 959-60 (quoting *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 242 (1st Cir. 1986)).

## C.  Analysis

With these principles in mind, and in light of the evidence presented, I turn to an analysis of the factors applicable to a motion for a preliminary injunction.

## 1. Likelihood of success on the merits

### a. Sufficiently retaliatory actions

Plaintiff contends that her reassignment is an adverse, retaliatory employment action that violated her First Amendment rights. She claims that "she was removed from her responsibilities" and was assigned to "college-level intern duties." ECF 20 at 8.

Defendant responds that plaintiff was not "demoted or punished," nor "stripped of the bulk of her responsibilities," nor "removed from the daily flow of activity." ECF 11 at 16. He also maintains that plaintiff's role was not reduced to "clerical duties." *Id.* According to the defense, much of plaintiff's job remained unchanged, including her pay, status as a full-time employee, job classification, class title, personal identification number, and working conditions. *Id.* at 15. Further, Belton contends that plaintiff was "still responsible for *supporting* development of external and internal communications[.]" ECF 11 at 5 (emphasis added).

"[T]he nature of the retaliatory acts committed by a public employer" only needs to "be more than *de minimis* or trivial." *Suarez*, 202 F.3d at 686 (emphasis in original). As noted earlier, a reassignment "need not result in a decrease in pay, title, or grade" to constitute an adverse employment action. *Sharp*, 164 F.3d at 933. A demotion can suffice "if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Id.*; *see also Love-Lane*, 355 F.3d at 779 (noting that plaintiff's reassignment, "which was a demotion in duties and responsibilities, qualifies as an adverse employment action for purposes of her free speech claim").

Plaintiff clears this standard. Previously, and central to her duties, she had direct contact with the press. But, on reassignment, she was prohibited from such interaction. *Compare* ECF 1-3 at 3, *with* ECF 1-4 at 4. Once a "lead worker," she was reduced to a support role. *Compare* ECF

1-3 at 6, *with* ECF 1-4 at 5. Once responsible for eight types of decisions, plaintiff was later responsible for only two. *Compare* ECF 1-3 at 5, *with* ECF 1-4 at 4. l. Thomson's newer role was clearly "less prestigious" and "less interesting." *Sharp*, 164 F.3d at 933. As Thomson put it in her testimony, "My previous job was a Porsche and the job I have now is a Yugo." ECF 35 at 27.

DNR's own emails contradict defendant's claim that plaintiff was not stripped of the bulk of her responsibilities. *See* ECF 20-1 at 2 ("Lt. Medellin has been assigned *all* communications and media relations duties/responsibilities for the Maryland Natural Resources Police") (emphasis added); ECF 20-6 at 3 ("Management has reassigned your [Thomson's] duties and has the right to do so."); ECF 20-8 at 2 ("As instructed, we have reassigned Candy's duties to Lt. Catherine Medellin").

And, notwithstanding defendant's suggestion to the contrary, these changes in responsibilities are not trivial merely because plaintiff's pay and some elements of her job remained constant. *See* ECF 11 at 4-5. Although plaintiff retained some of her duties, including writing press releases and other media content, she was stripped of her most significant responsibilities. By defendant's logic, a trial attorney's position is not made "objectively worse" if she is barred by her employer from appearing in court but is still allowed to write the briefs. "[S]upporting development" is simply not the same as developing. ECF 1-4 at 3. The assistant to the spokesperson is not the spokesperson.

### b. Speaking as a citizen upon a matter of public concern

The "content, form, and context" all indicate that Thomson's Facebook post pertained to a matter of public concern. *Connick*, 461 U.S. at 147.[14] This point is not contested by the parties.

---

[14] It is unclear whether employees still must speak on matters of public concern when the matter is unrelated to their employment. *Dible v. City of Chandler*, 515 F.3d 918, 927 (9th Cir.

Thomson's Facebook post addressed the decision of Ben Jealous, the Democratic gubernatorial candidate, to exclude a journalist from serving as a panelist at the only gubernatorial debate. The Supreme Court has recognized that "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of our system of government." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (internal quotations and citation omitted). Specifically, "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United v. Federal Election Commission*, 558 U.S. 310, 339 (2010) (internal quotation marks and citations omitted); *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 (1995); *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam).

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates . . . and all such matters relating to political processes." *Mills v. State of Ala.*, 384 U.S. 214, 218-19 (1966).

Additionally, Thomson's speech took the form of a Facebook comment. "Similar to writing a letter to a local newspaper, publicly posting on social media suggests an intent to 'communicate to the public or to advance a political or social point of view beyond the employment context.'" *Liverman*, 844 F.3d at 410 (quoting *Guarnieri*, 564 U.S. at 399). But, Thomson did not initiate the discussion. Rather, she commented in response to the posts of others on the issue of the candidate's decision to veto a reporter from serving on the panel for a key election debate. *See* ECF 20-5 at 2-3. This suggests that she was participating in an online public discussion and

---

2008). But, because it is clear that plaintiff spoke on a matter of public concern, I do not need to resolve the uncertainty.

"not simply airing personal grievances." *Cf. Liverman*, 844 F.3d at 410. Additionally, the fact that the speech was made online does not make it less worthy of the same level of protection as other speech. *Bland*, 730 F.3d at 386; *see also Ashcroft v. ACLU*, 542 U.S. 656 (2004); *Reno v. ACLU*, 521 U.S. 844, 870, (1997).

It is also clear that Thomson was speaking as a citizen and not pursuant to her official duties, as a Facebook post was not "ordinarily within the scope" of her duties. Although Thomson managed social media for NRP at that time, this fact does not place all social media—no matter how unrelated to NRP—within the scope of her duties. ECF 1-3 at 3-4. While she was at home before work hours, Thomson used a personal electronic device to comment on the Facebook post of another, on a topic unrelated to her NRP responsibilities.

### c. Employer's decision to take adverse employment action.

According to plaintiff, Secretary Belton reassigned her in retaliation for her Facebook post. Secretary Belton and high ranking employees of the DNR vigorously disputed that claim. They maintain that the Facebook post played no role in Thomson's reassignment. Instead, they claimed that the reassignment was the culmination of plaintiff's repeated failures to coordinate her efforts with DNR's Office of Communications.

In his testimony, Secretary Belton cited problems with the 150th NRP anniversary. Additionally, Schatz testified that plaintiff mishandled incidents at Ocean City Beach and Sandy Point State Park. Belton, Schatz, and Throwe all agreed that the Capital Gazette article was the last "straw." The Secretary "will avoid liability if he can demonstrate, by a preponderance of the evidence, that he would have made the same employment decision absent the protected expression." *Bland*, 730 F.3d at 375.

DNR leadership primarily relied on these three incidents to justify plaintiff's job reassignment. Yet, the criticisms appear unfounded, suggesting that perhaps they were manufactured to justify the reassignment. For example, Schatz blamed plaintiff for not coordinating NRP's press conference with the DNR Office of Communications in regard to the so called "Bones on the Beach" incident in Ocean City. But, the unrefuted testimony of plaintiff was that NRP did not hold a press conference. Moreover, plaintiff had no role in NRP's media response to the tragic drowning at Sandy Point; she was on vacation in Maine at the time. And, as to the Capital Gazette incident, Secretary Belton and his colleagues claimed that plaintiff should have notified the Office of Communications of the potential story. Yet, Belton learned of the accident the day after it occurred, from Colonel Ziegler. But, plaintiff did not learn of the accident until a day later, from someone outside DNR.

Although plaintiff learned at that time that a news article was being written, she had no reason to believe it would be critical of the NRP. Indeed, Rathgeb was best situated to make that determination, given his interaction with the newspaper reporter. And, following plaintiff's reassignment, he was subsequently given more media responsibilities, notwithstanding the Capital Gazette article.

Further, the record contains few documents corroborating DNR's criticisms of Thomson.[15] The only email in which DNR leadership clearly expresses dissatisfaction with Thomson is Schatz's email to Bortz on August 10, 2018, regarding Ocean City. *See* Belton Motion Ex. 3 at 1. Schatz's email to Thomson on August 29, 2018, regarding Sandy Point, is suggestive at best. *Id.* at 2. Nor does the record contain emails in which plaintiff was criticized for her supposed bungling

---

[15] The Court notes that the alleged criticisms by members of the Office of *Communications* were not communicated to Thomson by people in the business of communicating.

of the Capital Gazette article. To the contrary, Schatz's email on the poor coordination for the article was directed at Rathgeb. *Id.* at 4-5. Moreover, his separate email to Leatherbury and Zeigler did not even mention Thomson. The silence in the record speaks louder still when juxtaposed with the pages of glowing letters and outstanding performance reviews for plaintiff.

Notably, plaintiff was reassigned only three days after the post. And, in that three-day period, DNR leadership spoke to plaintiff about the post and disseminated several emails related to the post. Moreover, prior to plaintiff's reassignment, Schatz received an email from Chasse, Governor Hogan's communications director, criticizing Thomson's post. Critically, immediately after the reassignment, Schatz emailed Chasse, stating: "As instructed, we have reassigned Candy's duties to Lt. Catherine Medellin." ECF 20-8 at 2. This email undercuts any claim by the defense that the reassignment was the result of poor performance by plaintiff. The "As instructed" language is a clear reference to the Facebook post as the basis for the reassignment.

Temporal proximity of plaintiff's job reassignment, i.e., three days after her Facebook post, satisfied plaintiff's initial burden to establish that her protected speech was a "substantial factor" in her reassignment. *See, e.g.*, *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (one to two week lapse sufficed at pleading stage for causation); *Price*, 380 F.3d at 213 (a nine-month lapse created a "very close question," but the claim survived a motion to dismiss); *Caruso*, 973 F. Supp. 2d at 454 ("A period of seven days is undoubtedly short enough to give rise to an inference of causation" at summary judgment.). The timing of plaintiff's reassignment, coupled with the apparent pressure on DNR leadership from the Governor's Office, and the contemporaneous flurry of emails about the Facebook post among DNR leadership, all lead me to conclude, at this juncture, that plaintiff's Facebook post was the basis for her reassignment.

It appears that the defense assertions that plaintiff poorly coordinated with DNR's Office of Communications was merely a convenient rationalization for her reassignment, as there was little evidence of plaintiff's culpability. I cannot conclude that Thomson would have been reassigned in the absence of her Facebook post.

### d.  *Elrod-Branti* Exception

The question remains whether Belton was entitled to demote plaintiff because of her Facebook post. In this regard, the parties dispute whether the Court should apply the *Elrod-Branti* or the *Connick/Pickering* analysis to plaintiff's demotion. As recounted earlier in more detail, under *Connick-Pickering*, the employee's First Amendment interests must be balanced with the employer's interest in the efficient operation of a workplace. Under the *Elrod-Branti* exception, employees holding patronage positions do not enjoy First Amendment protection for their disloyal political speech.

Plaintiff argues that *Elrod-Branti* is inapplicable here because her comment "was not referencing the current governor, nor was it in anyway [sic] disloyal to his office." ECF 2-1 at 8. Citing her positive performance reviews, plaintiff adds that there is "no discord between the political ideology of the employee and the employer" in this case. *Id.* at 8; *see also* ECF 1, ¶ 3; ECF 1-2 at 3.

According to defendant, the *Elrod-Branti* exception applies even if plaintiff's comment "was not disloyal to the current Governor," because the "appropriate inquiry . . . concerns the *position*, not any *specific* communication." ECF 11 at 21. Further, defendant contends that the analysis should be directed "not only to support of a particular candidate or party, but to 'goals and implementation.'" ECF 11 at 22. Calling "a candidate from an opposing political party by a derogatory name" is "contrary to" the employer's "goals and implementation strategy." *Id.* at 22.

Defendant's reference to "goals and implementation" is premature at this stage of the analysis. Pursuant to *Elrod* and its progeny, courts consider whether "'there is room for political disagreement on goals or their implementation'" in order to determine if the employee was a policymaker. *Bland*, 730 F.3d at 375 (quoting *Stott*, 916 F.2d at 141) (alterations in *Bland*). However, the Court must first determine whether this case should be considered under the patronage cases, and this inquiry does not turn on whether plaintiff is a policymaker.

The *Elrod-Branti* exception applies to "politically-motivated dismissals of public employees." *Jenkins v. Medford*, 119 F.3d 1156, 1162 (4th Cir. 1997) (characterizing *Stott*, 916 F.2d 134). The Fourth Circuit has held that certain employees "may be lawfully terminated for *political* reasons under the *Elrod-Branti* exception to prohibited *political* terminations." *Jenkins*, 119 F.3d at 1164 (emphasis added). That is, for certain employees, terminations are permitted based on the employee's "political beliefs and party commitments" or the employee's disloyal political speech. *Branti*, 445 U.S. at 518; *see also Bland*, 730 F.3d at 402 n.5 ("[I]n cases in which the *Elrod-Branti* exception applies, and an employer thus can terminate his employees for political disloyalty, he may also terminate them for speech that constitutes such disloyalty.") (citing *Jenkins*, 119 F.3d at 1164).

However, the exception does not allow the government to terminate its employees for just any speech. *See Gentry v. Lowndes Cty., Miss.*, 337 F.3d 481, 488 (5th Cir. 2003) ("A position of trust and confidence . . . 'does not immunize public employer action unconnected to and unmotivated by [the] need for political loyalty.'") (quoting *Bonds v. Milwaukee County*, 207 F.3d 969, 979 (7th Cir. 2000)); *see also McKinley v. Kaplan*, 262 F.3d 1146, 1150 n.4 (11th Cir. 2001)) ("We have held that the *Elrod–Branti* line of cases applies when a public employee suffers an adverse employment action based on party affiliation or political beliefs rather than the content of

the employee's speech or expression."); *Barker v. City of Del City*, 215 F.3d 1134, 1139 (10th Cir.

2000); *Bonds*, 207 F.3d at 979; *cf. McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997) (concluding

that *Elrod-Branti* exception applies only when adverse employment action is based only on

political affiliation). *But see Biggs v. Best, Best & Krieger*, 189 F.3d 989, 994-95 (9th Cir. 1999)

("[O]ur decision in *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1332 (9th Cir. 1997),

. . . made clear that an employee's status as a policymaking or confidential employee would be

dispositive of any First Amendment retaliation claim.").

When the speech at issue is "'unrelated to job duties or political viewpoint,'" it "'runs too

remote from the interests that animate the exception.'" *Matrisciano v. Randle*, 569 F.3d 723, 732

(7th Cir. 2009) (quoting *Bonds*, 207 F.3d at 979). That is, the patronage cases "do not hold that an

individual surrenders all his freedom of speech by becoming a confidential or policymaking

employee of government." *Wilbur v. Mahan*, 3 F.3d 214, 217 (7th Cir. 1993).

Here, plaintiff alleges that she was reassigned for referring to gubernatorial candidate Ben

Jealous as an "assclown" on Facebook. She claims that she was not criticizing Governor Hogan

or his political party; instead, she was speaking about the Governor's electoral opponent. In short,

she asserts that she did not engage in disloyal speech.

As Chasse wrote in an email to Schatz, "this type of language—particularly about the

governor's political opponent—is extremely inappropriate from a state employee." ECF 20-5 at 2.

Thus, it appears that it was not plaintiff's politics so much as her impolite language that led to the

job reassignment. The *Elrod-Branti* exception is not meant to facilitate the ousting of employees

who are crude or impolite in their private lives.

    **e.  Balancing employee's speech rights against employer's efficiency interest**

*Pickering* and *Elrod-Branti* "tend[] to merge" in the Fourth Circuit. *See McVey*, 157 F.3d at 278. "Thus, a public employee, who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee." *Id.*; *Borzilleri*, 874 F.3d at 194; *Bland*, 730 F.3d at 374. Therefore, although *Elrod-Branti* seemingly does not apply, I must nevertheless apply *Stott* before turning to the *Pickering* balancing test.

First, I must determine whether "the position at issue, no matter how policy-influencing or confidential it may be, relates to partisan political interests . . . or concerns." *Blair*, 549 F.3d at 959 (quoting *Stott*, 916 F.2d at 141) (original omissions). "'At a very high level of generality,'" the responsibilities of a public information officer or senior press official—even one working on the seemingly apolitical issues like traffic—may relate to political concerns. *See Bland*, 730 F.3d at 375 (quoting *Fields v. Prater*, 566 F.3d 381, 386 (4th Cir. 2009)). For example, the Third Circuit concluded that the role of "Assistant Director of Public Information" for a county could not "be performed effectively except by someone who shares the political beliefs" of the county's elected officials. *Brown v. Trench*, 787 F.2d 167, 170 (3rd Cir. 1986). Similarly, in *Branti*, 445 U.S.at 518, the Supreme Court noted that "the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments."

Maryland has not classified the position of NPR's Public Information Officer as a position for which political affiliation is important. *See* ECF 1-3 at 2. *Compare* S.P.P. § 6-403 *with* S.P.P. § 6-405. Moreover, although management service employees, like Thomson, are at-will

employees, they "may not be terminated for the purpose of creating a new position for another individual's appointment because of that individual's political affiliation, belief, or opinion." S.P.P. § 11-305(c). Nevertheless, the State's designation is not dispositive. *See Akers v. Caperton*, 998 F.2d 220, 225 n.7 (4th Cir. 1993). "[L]egislative findings are given deference, [but] '[t]he matter is a question of law to be ultimately decided by the courts.'" *Id.* (quoting *Stott*, 916 F.2d at 142-43 (citation omitted)).

The second step of the analysis requires a concrete review of the particular responsibilities of plaintiff's job description to "determine whether" the position "resembles a policymaker, a privy to confidential information, [or] a communicator." *Stott*, 916 F.2d at 142. I shall not look past plaintiff's original job description (ECF 1-3) as there is no indication that the description contains any "'systematic unreliability.'" *Bland*, 730 F.3d at 375 (quoting *Nader*, 549 F.3d at 961).

The duties listed in the Position Description show that the Public Information Officer serves as a "communicator" for NRP. To name a few duties, the Officer (1) acts as a DNR and NRP spokesperson, "responding to media inquiries about breaking stories"; (2) "prepares/disseminates press releases about breaking stories involving the NRP to inform the media/public"; and (3) writes speeches for the Superintendent—the head of the NRP—for agency events and public appearances. ECF 1-3 at 4. Nevertheless, plaintiff contends that she is not a policymaker because she "has no degree of discretion in communicating policies or positions." ECF 2-1 at 9. Further, all of her "press releases . . . must be approved by the Department before they are disseminated to the public." ECF 8 at 2. But, one of the Public Information Officer's principal duties is to act as a spokesperson, "responding to media inquiries about breaking stories[.]" ECF 1-3 at 4. This role necessarily entails that the Public Information Officer speak with the public in real time in the name of policymakers. Discretion is inherent in such a role. *Cf.*

*Brown*, 787 F.2d at 170 ("[H]er principal duty was to act as spokesman for the Commissioners and help promote county projects. Brown could, therefore, be dismissed because of her political affiliation without any violation of her first amendment rights.").

Accordingly, I shall assume, *arguendo*, that plaintiff had "a confidential, policymaking, or public contact role," whose First Amendment rights may therefore be more easily overcome by the government's interest in an efficient workplace. *Stacy*, 157 F.3d at 278.

I must next consider the government's interests as an employer, pursuant to *Pickering*. According to plaintiff, there has been "no workplace disruption" or harm to workplace "efficiency or harmony" as a result of her Facebook comment. EFC 2-1 at 8. Further, plaintiff contends that an employer cannot rely on "*fear* of disruption in external operations and relationships . . . to justify its adverse employment action." ECF 8 at 6 (emphasis in original).

Defendant did not provide any evidence that Thomson's speech harmed the employer's operations. During the hearing on November 2, 2018, defendant's counsel conceded that "there was no evidence that actually goes to . . . *Ridpath*. . . . There was no testimony on that." ECF 34 at 117. Indeed, defendant does not allege that Thomson "impaired harmony among coworkers," "damaged close personal relationships," "impeded the performance of the public employee's duties" or "abused the authority and public accountability that the employee's role entailed." *Ridpath*, *supra*, 447 F.3d at 317. Nor did defendant state that he anticipated such harms. The only harm that defendant even alluded to was that an employee calling "a candidate from an opposing political party by a derogatory name" is "contrary to the goals or implementation strategy" of the NRP. ECF 11 at 22.

According to Chasse, plaintiff's "type of language—particularly about the governor's political opponent—is extremely inappropriate from a state employee." ECF 20-5 at 2. But,

inappropriate language unrelated to the employee's employment, and spoken outside the workplace, does not intrinsically harm the employer's interests. The State must show or at least articulate the harm. *Cf. Flanagan v. Munger*, 890 F.2d 1557, 1564-67 (10th Cir. 1990) (concluding police chief's prohibition on an officer selling pornographic videos at his video store violated officer's freedom of speech because no actual or potential internal disruption could be shown).

Therefore, this factor favored plaintiff.

## 2. Irreparable Harm

When plaintiff filed her preliminary injunction, she had only a few weeks before her scheduled departure from NRP. Nevertheless, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Legend Night Club*, 637 F.3d at 302 (quoting *Elrod,* 427 U.S. at 373). Such losses cannot be adequately compensated by monetary damages. *Id.* at 302 (quoting *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)). Moreover, given plaintiff's imminent departure from DNR, a preliminary injunction represented plaintiff's only means of restoring her First Amendment rights. This factor weighed in plaintiff's favor.

## 3. Balance of Equities

If a plaintiff demonstrates a likelihood of irreparable harm, "the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant." *Corporate Healthcare Financing*, *supra*, 2006 WL 1997126, at *4 (citing *Safety–Kleen, Inc. (Pinewood) v. Wyche,* 274 F.3d 846, 858–59 (4th Cir. 2001); *Direx Israel*, 952 F.2d at 812)). In my view the requested injunction would not cause undue hardship to the State and was outweighed by the injury to plaintiff's First Amendment rights.

DNR would not be unduly burdened by restoring plaintiff's responsibilities for a few days. After all, plaintiff held the position for nearly five years, consistently receiving outstanding reviews each.  Moreover, restoring plaintiff's responsibilities would not impose new costs on defendant, as plaintiff's salary was not cut. Finally, any harm to the State was limited, as plaintiff previously gave notice of her resignation, effective November 6, 2018.  In other words, as of the date of the preliminary injunction, she had only four remaining days of employment at DNR.

### 4.  Public Interest

In my view, this factor weighed in plaintiff's favor.  Generally, "[u]pholding constitutional rights is in the public interest." *Legend Night Club*, 637 F.3d at 301 (citing *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). This argument is particularly strong here. When the government retaliates against an employee for exercising First Amendment rights, especially in the period just before an election, it chills the First Amendment rights of other government employees. The chilling effect was intensified here when Zeigler notified nearly all NRP employees of the change in plaintiff's duties.  The injunction thawed that chill.

### 5.  Security

Rule 65(c) of the Federal Rules of Civil Procedure requires that a court "may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Fourth Circuit has explained that this rule "is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir.1999). Ordinarily, "failure to require a bond upon issuing injunctive relief is reversible error." *Id.* Although a court "is not free to disregard the bond requirement altogether," a court "has discretion to set the bond amount 'in such sum as the court deems proper.'" *Id.* (quoting rule).[16]

Accordingly, I set a bond of $250.00.

---

[16] The district court has "discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm." *Md. Dept. of Human Res. v. U.S. Dept. of Agric.*, 976 F.2d 1462, 1483 n. 23 (4th Cir.1992); 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2954, at 293 (2d ed. 1995, April 2011 Supp.) (stating that a "court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant").

## V.    Conclusion

The Court weighed the requisite factors as to a preliminary injunction.  On the basis of the factors, and in light of the evidence, I concluded that Thomson established her entitlement to a preliminary injunction, requiring the reinstatement of her job duties through November 6, 2018.


Date: November 26, 2018

_____/s/_____
Ellen Lipton Hollander
United States District Judge